**UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO**

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, **Luis Polo,** being duly sworn, do hereby depose and state the following:

1.      I am a Border Patrol Agent with the United States Border Patrol and have been so employed since March 27, 2006.  As a Border Patrol Agent, I have gained experience in conducting investigations related to the illegal entry of aliens into United States.  I attended the Federal Law Enforcement Training Center at Artesia, New Mexico, where I received training for the purpose of accomplishing my Border Patrol duties, which includes training in immigration related law and matters.  Furthermore, I also receive training on a continuing basis for the purpose of maintaining my proficiency pertaining to Border Patrol work.

2.      Investigation reveals that, on or about Sunday, April 12, 2026, **Miguel Antonio GALVA-TAVAREZ** re-entered the United States illegally, upon arriving by boat at or near Camuy, Puerto Rico, after having been previously deported / removed from the United States. Therefore, this Affidavit is made in support of a Criminal Complaint against **GALVA-TAVAREZ** based on violation of **Title 8, _United States Code_, Section 1326(a),** Re-entering the United States after being previously deported or removed.

3.      I make this affidavit based on my own personal knowledge and on oral and written reports by other federal, state, and/or local law enforcement agents and officers that investigated this matter.  This affidavit does not contain all the information derived from this investigation only that which is sufficient to demonstrate probable cause to believe that a crime has been committed.

**PROBABLE CAUSE**

4.      On or about Sunday, April 12, 2026, at approximately 02:00 p.m., an anonymously concerned citizen reported a blue in color, makeshift yawl type vessel approaching a known secluded beach area at or near Camuy, Puerto Rico, which is known for narcotics and smuggling activity.

5.      After making arrival, the vessel was observed departing westbound at a high rate of speed.

6.      United States Coast Guard (USCG) Sector San Juan (SSJ) was notified.

7.      USCG-SSJ passed on the information to all their assets and components.

8.      On Sunday, April 12, 2026, at approximately 06:16 p.m., USCG-SSJ received a report from one of their air assets, HC-144, of the sighting of a twenty-five foot blue in color yawl type vessel, bearing the name *Mariel* and apparent registration numbers BR-E40-2258SPM, with two persons on board, powered by two outboard engines, traveling westbound at a rate of speed of 18 knots.

9.      USCG Cutter (USCGC) *Joseph Tezanos* was diverted to intercept the vessel, with vectoring assistance from HC-144 USCG aircraft.

10.      USCGC *Joseph Tezanos* intercepted the vessel at sea at approximately 18 nautical miles northwest of Aguadilla, Puerto Rico, at coordinates 18.70417 North, -67.2975 West.

11.      A Basic Initial Safety Sweep was conducted, revealing two individuals claiming Dominican Republic nationality and lacking documentation of legal authorization to be present in the United States.

12.      The vessel master was identified as Yander Jose Luis Pena, date of birth March 30, 2004, and the passenger and master's assistant **Miguel Antonio GALVA-TAVAREZ.**

13.      Record checks on Yander Jose Luis Pena revealed that he had previously removed

2

from the United States on or about March 23, 2026.

14.     On Sunday, April 12, 2026, at approximately 10:30 p.m., the Rapid Response Team teleconference was convened, where Coastal Border Interagency Group partners were in concurrence that Border Patrol would assume custody of the two illegal aliens, the intercepted vessel, and the recovered satellite radio, tracker, and two GPS devices.

15.     Puerto Rico Police Department Maritime Unit (FURA) in Aguadilla was contacted in order to transfer the two encountered subjects and the intercepted vessel.

16.     On Monday, April 13, 2026, during early morning hours, FURA Agents and Ramey Station Border Patrol Agents (BPAs) on board *Cobra 67*, met with USCG at sea, and assumed custody of the two subjects, vessel, and electronic devices.

17.     On Monday, April 13, 2026, at approximately 05:45 a.m., the two subjects, vessel, and electronic devices were transported from *Cobra 67* to waiting BPAs at Rompeolas Beach boat ramp in Aguadilla, Puerto Rico.

18.     BPAs identified themselves as immigration officers and proceeded to interview both encountered subjects, including **GALVA-TAVAREZ**.

19.     BPAs questioned both subjects, including **GALVA-TAVAREZ** as to their citizenship and nationality.

20.     Both subjects, including **GALVA-TAVAREZ**, freely and voluntarily admitted to being unlawfully present in the United States.

21.     **GALVA-TAVAREZ** admitted being a citizen and national of the Dominican Republic.

22.     Both subjects, including **GALVA-TAVAREZ**, were arrested and transported to USBP Ramey Station in Aguadilla, Puerto Rico, for further investigation, processing, and removal proceedings.

23.    Once at Ramey Station, **GALVA-TAVAREZ's** photograph and fingerprints were taken and entered into different law enforcement database systems.

24.    Record checks yielded positive results, indicating that **GALVA-TAVAREZ** possesses prior immigration history.

25.    As to **GALVA-TAVAREZ's** immigration history:

(a)    On or about July 2024, **GALVA-TAVAREZ** illegally entered the United States at or near Cabo Rojo, Puerto Rico.

(b)    On December 13, 2024, **GALVA-TAVAREZ** was encountered at Departure Control Inspection at the Luis Muñoz Marin San Juan Airport while attempting to gain access through the Transportation Security Administration (TSA) at the security checkpoint. TSA alerted Customs and Border Protection (CBP) as **GALVA-TAVAREZ** presented a Dominican Republic Facilitation Document and Dominican Republic voter's registration card. **GALVA-TAVAREZ** was escorted to Passport Control Secondary inspection area for further questioning. At secondary inspection, **GALVA-TAVAREZ** stated that he was on his way to the Dominican Republic because it was hard to find work and he wanted to be with his family. **GALVA-TAVAREZ** also stated that upon his illegal entry and arrival to Cabo Rojo, Puerto Rico, that once he made entry, he was on the street until he met a person named Raul, in Puerto Rico, that helped him find work. **GALVA-TAVAREZ** stated that he worked in construction and carpentry.

(c)    On that same day, December 13, 2024, a removal order was issued for **GALVA-TAVAREZ**, who was officially and physically removed, from the United States to the Dominican Republic from the Port of San Juan, Puerto Rico (SJU-Airport).

4

(d)    On or about January 04, 2025, **GALVA-TAVAREZ** claims to have illegally entered the United States at or near Cabo Rojo, Puerto Rico.

(e)    On or about March 23, 2026, **GALVA-TAVAREZ** was encountered at the Panamerican Dock west at San Juan, Puerto Rico, attempting to board MV *Kydon*, "*Ferries del Caribe*" to travel to the Dominican Republic.  Personnel alerted CBP as **GALVA-TAVAREZ** presented a Dominican Republic Facilitation Document and a Dominican Republic voter's registration letter.  Once again, **GALVA-TAVAREZ** was claiming that he was heading to the Dominican Republic because it was hard to find work, and he wanted to be with his family.  Also, and once again, for the second time, **GALVA-TAVAREZ** claimed that upon his illegal entry and arrival to Cabo Rojo, Puerto Rico, once he made entry, he was on the street until he met a person named Raul in Puerto Rico that helped him find work.  At the time **GALVA-TAVAREZ** stated that he worked in construction and carpentry.

(f)    On March 23, 2026, another removal order was issued for **GALVA-TAVAREZ** and he was again officially and physically removed from the United States to the Dominican Republic from the Port of San Juan, Puerto Rico (seaport).

26.    After his arrest, Border Patrol Agents advised **GALVA-TAVAREZ** of his right to legal representation and his right to speak with the Consular Officer of his native country, the Dominican Republic.

27.    **GALVA-TAVAREZ** re-entered the United States at a place other than a designated Port of Entry.

28.    **GALVA-TAVAREZ** is a national and citizen of the Dominican Republic who does not possess any immigration documents allowing him to enter, re-enter and/or to remain in the United States legally, to include but not limited, the lack of express consent from the Attorney

5

General of the United States, or his successor, the Secretary of the Department of Homeland Security, to reapply for admission into the United States. Furthermore, **GALVA-TAVAREZ** was not inspected, admitted, or paroled into the United States by an Officer of the Bureau of Customs and Border Protection.

29.    **GALVA-TAVAREZ** does not have any petitions pending with the Bureau of Citizenship and Immigration Services.

30.    Based upon my training, experience, and participation in other investigations, and based on the facts revealed in this investigation, I believe that sufficient probable cause exists to demonstrate the commission of a violation of federal law by the above-mentioned subject, to wit, a violation of Title 8, *United States Code,* Section 1326(a).

_____
Luis Polo
Border Patrol Agent

Subscribed and sworn before me pursuant to FRCP 4.1 at _1259PM_ by telephone, this _17th_ day of April 2026.

_____
Honorable Marshal D. Morgan
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF PUERTO RICO

6